*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0277P (6th Cir.)
File Name: 04a0277p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ANTHONY MARTIN,
  *Plaintiff-Appellant,*

  *v.*

INDIANA MICHIGAN POWER
COMPANY, d/b/a American
Electric Power,
  *Defendant-Appellee.*

No. 02-2343

———————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 00-00218—Wendell A. Miles, District Judge.

Argued: March 17, 2004

Decided and Filed: August 23, 2004

Before: NORRIS and COLE, Circuit Judges;
ECONOMUS, District Judge.*

———————————

* The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

## COUNSEL

**ARGUED:** Stephen D. Turner, LAW, WEATHERS & RICHARDSON, Grand Rapids, Michigan, for Appellant. Joseph J. Vogan, VARNUM, RIDDERING, SCHMIDT & HOWLETT, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Stephen D. Turner, Gregory N. Longworth, LAW, WEATHERS & RICHARDSON, Grand Rapids, Michigan, for Appellant. Joseph J. Vogan, Peter A. Smit, VARNUM, RIDDERING, SCHMIDT & HOWLETT, Grand Rapids, Michigan, for Appellee.

  COLE, J., delivered the opinion of the court, in which ECONOMUS, D. J., joined. NORRIS, J. (p. 21), delivered a separate opinion concurring in part and dissenting in part.

———————————

## OPINION

———————————

  R. GUY COLE, JR., Circuit Judge. Plaintiff-Appellant Anthony Martin claims that his employer, Indiana Michigan Power Company, d/b/a American Electric Power ("AEP"), violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19, by failing to pay him time-and-a-half for hours worked in a given week in excess of forty hours. AEP counters that Martin is a bona fide administrative or professional employee, exempt from the FLSA's overtime requirements. The parties filed cross-motions for summary judgment, and the district court granted summary judgment for AEP, holding that Martin was exempt from overtime pay requirements because he was both an administrative employee and a computer professional. For the reasons below, we REVERSE the judgment of the district court and REMAND for entry of summary judgment in favor of the plaintiff, and for calculation of damages, including liquidated damages.

# I. BACKGROUND

Prior to AEP's reorganization of its Information Technology ("IT") department, Martin held the position of "Computer Security/Standards Technician," which AEP classified as nonexempt. On November 1, 1998, when the department was reorganized, Martin's title was changed to "IT Support Specialist," which AEP classified as an exempt position. According to AEP, the purpose of the reorganization was to "push down responsibilities to workers," "to delegate more authority," and to "flatten the organization."

Mike Thornburg, Martin's supervisor, describes the function of his IT Support team as follows: "Maintaining the computer workstation software, troubleshooting and repairing, network documentation, that is our primary job. We were a maintenance organization that takes care of computer systems." The computers that Martin works on are workstations (or "PCs") at individual desks connected to a local area network ("LAN"); Martin does not work on the plant process computer – "which deals with the plant, what's going on as far as the reactor operators"– which is a different system.

When people at the plant have problems with their computers, they call the help desk where the help desk employees put the problems into a database as "help desk tickets," which Martin prints out. Martin responds to these help desk tickets. He goes to the location indicated where he attempts to determine the nature of the problem, to "troubleshoot" it to determine how to proceed, and to repair the problem if possible. Martin installs software, such as Microsoft's Office 97, on individual workstations. He troubleshoots Windows 95 problems and installs provided software patches.

If Martin cannot fix a problem, he will report the problem and how he tried to fix it to Thornburg. Thornburg will

decide whether to request service from the manufacturer or order a replacement part or unit. Martin, however, does not decide or make recommendations as to whether a piece of equipment must be serviced or replaced. Nor has he written reports on his troubleshooting or repair activities. He has not recommended the purchase of any equipment, hardware, or software, although Thornburg considers Martin's comments on printers and problems "valuable" in his own decision making process.

In addition to processing help desk tickets, Thornburg has directed Martin to complete a variety of other tasks. First, for a period of time while the nuclear reactors were shut down between November 1998 and May 2000, Martin relocated workstations to trailers and temporary buildings. Sometime in 2000, Cook brought in contractors to move workstations. Thornburg testified that, prior to that, everyone in IT Support – including Thornburg and Martin – was spending so much time moving workstations that they were not able to carry out their primary job as a maintenance organization.

Second, Martin was assigned to install hardware and cable for the network, including network components such as hubs, switches, and routers, when Cook was physically expanding the LAN to trailers and new buildings. Martin worked in the wiring closets: terminating the cables (that is, putting connectors on the ends of the cables), plugging them into the hubs, and verifying that they were connected by phoning the system administrator to confirm that the hubs had appeared on the network. Martin was not involved in designing the configuration of either the cables or the hardware he installed, nor does he install any programs onto the network. Third, on January 2, 2001, Thornburg assigned Martin to clean up the wiring closets, to make sure the master network diagram accurately reflected what was physically in the closets and update it if necessary, and to get the locks changed, if possible, so that one key would open all the closets.

Shortly before Thornburg's February 28, 2001, deposition, Martin received another assignment. According to Thornburg, he assigned Martin "to review a Windows 2000 operating system that we have just developed." At the time of the deposition, Thornburg explained that Martin was in the "process" of "preparing" to do the review. For the assignment, Martin was supposed to "review the desktop operating system in our applications to make sure they work as he uses them in the field. And if not, I expect him to make recommendations for corrections." This assignment – apparently made after the litigation commenced – is the first of this type for Martin. As Thornburg put it, Martin's duties were "evolving."

Martin has no computer certifications and no degree beyond high school. He has taken one course in microcomputing, a class in using Windows 2000, and four, week-long hands-on computer training classes. Martin has a work bench located in a common work area – also referred to as a "workshop" in the depositions. Martin does not have his own phone line; everyone in the area shares a "shop phone." He wears a blue short-sleeved work shirt with two pockets on the front, a name badge that says "Tony," and a badge that says "D.C. Cook, CSS Section"; blue work pants; and work boots.

## II. ANALYSIS

This Court reviews de novo a district court's grant of summary judgment. *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003). Summary judgment is appropriate if, after examining the record and drawing all inferences in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992).

The FLSA requires employers to pay their employees time-and-a-half for work performed in excess of forty hours per week, 29 U.S.C. § 207(a)(1), but exempts employers from this requirement with respect to individuals "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). To avoid paying overtime to Martin, AEP must prove that he falls within one of these exempt categories. AEP argues that Martin is exempt as both an "administrative" employee and a "computer professional," which is a subclass of "professional" employees.

The exemptions to the FLSA's overtime provisions are "to be 'narrowly construed against the employers seeking to assert [them],'" *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)), and the employer bears not only the burden of proof, but also the burden on each element of the claimed exemption. *Id.* Because the burden of proof is shifted, Martin is entitled to summary judgment unless the defendant can come forward with evidence at least creating a genuine issue of material fact as to whether Martin meets each and every element of the exemption. If AEP fails to proffer such evidence, not only must its motion for summary judgment be denied, but summary judgment for Martin must be granted. *See Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 407 (6th Cir. 2004) (Suhrheinrich, J. concurring) (asserting that Schaefer was entitled to summary judgment because "[i]n my view, AEP has, at a minimum, failed to create a genuine issue of fact on the question of whether Schaefer's primary duty 'includes work requiring exercise of discretion and independent judgment.'").[1]

---

[1] In additional to this shifting of the burden of proof, Martin argues that the employer has to prove each element to a higher burden of proof than to a preponderance of the evidence, citing *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 691 n.4 (6th Cir. 2001) ("The defendant must establish through 'clear and affirmative evidence' that the employee meets every requirement of an exemption."). *Ale* and the other circuits that have articulated this "clear and affirmative evidence" language, *see*

For purposes of this analysis, we view the facts in the light most favorable to AEP. The facts regarding Martin's workplace tasks are largely undisputed. The parties do disagree, however, about how much time Martin spends on hardware versus software tasks and how much time Martin spent moving work stations with or without the help of contractors. These disputes, however, are ultimately irrelevant because neither Martin's hardware nor software work exempts him, and, regardless of how much time Martin spent moving computers, his others tasks are no more exempt.

*A. Computer Professional Exemption*

To establish that Martin is a "computer professional" under the regulations and therefore not entitled to overtime, AEP must demonstrate that (1) the employee "is compensated on a salary or fee basis at a rate of not less than $250 per week" or that the employee "is compensated on an hourly basis at a rate in excess of 6 1/2 times the minimum wage"; (2) the employee's "primary duty consists of the performance of . . . [w]ork that requires theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering, and [the employee is] employed and engaged in these activities as a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker in the computer software field . . . "; and (3) the employee's primary duty "includes work

---

*Klinedinst v. Swift Investments, Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001); *Donovan v. United Video, Inc.*, 725 F.2d 577, 581 (10th Cir. 1984), have done so without explanation of what the phrase means. Martin, perhaps drawing from the similarity to the phrase "clear and convincing evidence" urges us to hold that *Ale* sets a heightened evidentiary standard. Alternatively, "clear and affirmative evidence" may simply be a way of restating what we have said above: the employer bears the burden of proving each and every element of the exemption in a remedial statute that is to be narrowly construed against the employer. Since the meaning of the phrase would not change the result in this case, any exposition by us on the intentions of the *Ale* court would be mere dicta.

requiring the consistent exercise of discretion and judgment." 29 C.F.R. §§ 541.3(a)(4), 541.3(e).

First, AEP must establish that Martin is payed on a salary or fee basis at a rate of not less than $250 per week or that he is compensated on an hourly basis at a rate in excess of 6 1/2 times the minimum wage. 29 C.F.R. § 541.3(e). The evidence establishes that Martin is paid a salary. It does not matter that Martin must make up partial-day absences or that Martin's hours are prescribed and he must obtain approval from his supervisor to vary his hours. *See Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 516 (6th Cir. 2004); *Schaefer*, 358 F.3d at 400. Martin argues in his reply brief that he is not a salaried employee because AEP pays him straight overtime for some overtime hours, based on *Kennedy v. Commonwealth Edison Co.*, 242 F.Supp.2d 542 (C.D.Ill. 2003), which subsequently has been vacated and reconsidered at *Kennedy v. Commonwealth Edison Co.*, 252 F.Supp.2d 737 (C.D.Ill. 2003). We need not consider this novel (and only partially briefed) argument, however, because we can decide Martin's status on the ground below.

AEP must raise a genuine issue of fact regarding whether Martin's "primary duty consists of the performance of . . . [w]ork that requires theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering, and [whether he is] employed and engaged in these activities as a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker in the computer software field." 29 C.F.R. §§ 541.3(a)(4). Thus, although Martin is not a systems analyst, programmer, or software engineer, he could still be exempt from overtime if his work "requires theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering."

The district court concluded that Martin was a computer professional: "Martin falls within the exemption for a

professional employed in a computer-related occupation: there is no genuine dispute that his *work requires highly-specialized knowledge of computers and software*, and the evidence shows that he customarily and regularly exercises discretion and independent judgment in his work." (emphasis added). The district court made an understandable mistake, one that arises from the common perception that all jobs involving computers are necessarily highly complex and require exceptional expertise. However, the regulations provide that an employee's primary duty must require "theoretical and practical application of highly-specialized knowledge *in computer systems analysis, programming, and software engineering*" not merely "highly-specialized knowledge *of computers and software*." This is an important difference. The former is a narrower class of jobs that requires a different level of knowledge and training than the latter. Further, it is a distinction which will only become more relevant as the range of computer-related jobs continues to broaden.

Martin does not do computer programming or software engineering; nor does he perform systems analysis, which involves making actual, analytical decisions about how Cook's computer network should function. Rather, Martin's tasks – installing and upgrading hardware and software on workstations, configuring desktops, checking cables, replacing parts, and troubleshooting Windows problems – are all performed to predetermined specifications in the system design created by others. As Martin testified, he is provided the standard "desktop" for installation on the computers he configures, but he is not involved in determining what the desktop should look like. Thornburg explained, as we noted above, that IT Support is "a maintenance organization that takes care of computer systems."

29 C.F.R. § 541.303(b) further clarifies the work involved in systems analysis, programming, and software engineering that falls under the exemption:

To be considered for exemption under § 541.3(a)(4), an employee's primary duty must consist of one or more of the following:

(1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

(2) The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or

(4) a combination of the aforementioned duties, the performance of which requires the same level of skills.

AEP selectively identifies certain words from this regulation – particularly "consulting with users" and "testing" – and applies them out of context. There is simply no evidence that Martin "consults with users, to determine hardware, software, or system functional specifications." Martin "consults with users" for purposes of repair and user support, not to determine what "hardware, software, or system functional specifications" the Cook facility will employ, as a systems analyst might. Likewise, when Martin does "testing," he is testing things to figure out what is wrong with a workstation, printer, or piece of cable so that he can restore it to working order. He is not doing the type of testing that is involved in creating a system, determining the desired settings for a system, or otherwise substantively affecting the system. Indeed, he is merely ensuring that the particular machine is working properly according to the specifications designed and tested by other Cook employees. Maintaining the computer system within the predetermined parameters does not require "theoretical and practical application of highly-specialized

knowledge in computer systems analysis, programming, and software engineering."

Martin has one project that might fall under the category of systems analysis: the Windows 2000 review. This project was apparently assigned after the instant lawsuit commenced, and, according to Thornburg, Martin was only "*in the process right now of preparing* to review a Windows 2000 operating system," as of the date of Thornburg's deposition. Even were we to conclude that this project is systems analysis, Thornburg was unable to provide any estimate of the amount of time that he expected Martin would spend on the project but did indicate elsewhere that Martin had various other assignments. This single project does not make systems analysis Martin's primary duty.

Finally, the dissent suggests that there is a dispute of material fact regarding whether Martin took training courses teaching him to develop standards. Even if such a factual dispute exists, it is not material because it is the job that one does, not the job that one is trained to do, that determines exempt status. We are required to analyze how the employee is actually spending his time, *see* 29 C.F.R. § 541.3(e); *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 689-90 (6th Cir. 2001), not what he is trained to do (but is not doing as his primary duty) or what he is training to do in the future. Nor are trainees bona fide computer professionals. 29 C.F.R. § 541.303(c). Only at such a time that systems analysis becomes Martin's primary duty can AEP classify him as a bona fide computer professional.

Since AEP has only presented one task – the Windows 2000 project – that might fall under the "computer professional" exemption and since, even viewing the facts in the light most favorable to AEP, that task is not Martin's primary duty, AEP has failed to raise a genuine issue of material fact regarding whether Martin is a bona fide computer professional. AEP has not met its burden under the computer professional exemption.

## B. Administrative Exemption

To establish that Martin is a bona fide administrative employee under the applicable Department of Labor ("DOL") regulations, AEP must demonstrate that: (1) the employee is "compensated on a salary or fee basis at a rate of not less than $250 per week"; (2) the employee's "primary duty consists of . . . [t]he performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers"; and (3) the employee's primary duty "includes work requiring the exercise of discretion and independent judgment." 29 C.F.R. §§ 541.2, 541.214.

Martin is entitled to summary judgment because AEP has neither established that, nor raised a genuine issue of material fact regarding whether, Martin's primary duty is "directly related to management policies or general business operations of his employer or his employer's customers." 29 C.F.R. §§ 541.2(a)(1), 541.214(a). This provision, in addition to describing the types of activities performed by an exempt employee, "limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers." 29 C.F.R. § 541.205(a).

AEP's only argument that Martin's work is "directly related to management policies or general business operations of the employer" is that Martin's work is not production work. That is, he is not producing electricity because he is not an "operator" running the nuclear power equipment – and therefore his work is administrative and thus "directly related to management policies or general business operations of the employer." Under AEP's theory, shippers of radioactive waste, the individuals who don radiation suits and perform maintenance work on the reactors, the janitorial staff, the security guards, the cooks in the company cafeteria, and various other workers including Martin are all doing work "relating to the administrative operations of the business"

purely because they do not operate the nuclear reactors. *See Schaefer*, 358 F.3d at 402 (holding that a shipper of radioactive material was not doing administrative work). We have rejected the argument that all work that is not production work is automatically "directly related to management policies or general business operations of the employer." *Id*. at 402-403. Indeed, AEP made and we rejected this very argument in *Schaefer*. AEP attempts to distinguish *Schaefer* by arguing that the waste that was being shipped in *Schaefer* was a direct by-product of the production of electricity. But such an argument misses the point. AEP's error is in concluding that all work is either related to "the administrative operations of the business" or production work. The regulations do not set up an absolute dichotomy under which all work must either be classified as production or administrative. Rather, the regulations distinguish production work from the administrative operations of the business at 29 C.F.R. § 541.205(a) – thus production work cannot be administrative – and then go on to define the administrative operations of the business at 29 C.F.R. § 541.205(b). To accept AEP's alternate reading of 29 C.F.R. § 541.205(a) as setting up an absolute dichotomy would render the further definition of "the administrative operations of the business" in 29 C.F.R. § 541.205(b) utterly superfluous.

Martin's primary job duty does not "relat[e] to the administrative operations" at Cook. "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). As we have noted, Thornburg described his team as a "maintenance organization that takes care of computer systems." Martin is in no way involved in "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." *See also Renfro*, 370 F.3d at

517 (AEP's "planners" were bona fide administrative employees where their primary duty fell within this definition of "servicing" the business). Martin's job, instead, is to assist in keeping the computers and network running to the specifications and designs of others.

Nor is Martin's work "of substantial importance to the management or operation of the business of his employer." 29 C.F.R. § 541.205(a). Work that is of substantial importance "is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole," but includes employees whose work "affects policy or whose responsibility it is to execute or carry it out." 29 C.F.R. § 541.205(c). And an employee's work need not affect operation of the business *as a whole* to meet this criterion: it is enough that the employee's "work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." *Id*.

AEP never presents an argument that Martin's work *itself* is "of substantial importance to the management or operation of the business of his employer." Indeed, AEP could not successfully argue that Martin's work itself is "of substantial importance to the management or operation of the business of his employer" because Martin makes no decisions that affect even the small segment of the company's operations in which his work is performed. He does not determine what types of workstations, network, hardware, or software AEP employs; he is not involved in the design or development of AEP's network; he does not decide what software will be available to AEP's computer users or determine how that software will be configured; and he does not decide or recommend when equipment must be serviced or replaced. Rather, he sets up and repairs parts of a system wholly designed and approved by others. There is no evidence that he has any input into the nature of the computer resources available to AEP employees.

AEP argues that Martin's work is "complex," not "routine" or "clerical," and thus of substantial importance. AEP derives this requirement from a portion of the regulation that states: "An employee performing routine clerical duties obviously is not performing work of substantial importance . . . ." 29 C.F.R. § 541.205(c)(2). AEP attempts to derive the negative from this proposition and say that duties that are complex rather than "routine clerical work" *are* of substantial importance. This argument is the logical equivalent of saying that because a chihuahua is obviously not a cat, then every animal that is not a chihuahua is a cat. Without addressing the issue of whether Martin's work is actually "complex," it is sufficient to say that mere complexity would not make his work substantially important under the regulations.

AEP next argues that Martin's work is of "substantial importance" because of the value of the systems he works on and the consequences of mistakes. The regulations, however, explain that it is the work itself that must be of substantial importance – not the size of the consequences or loss that may result from improper performance of the employee's duties. As the regulations note, an employee operating a very expensive piece of equipment, a messenger boy entrusted with carrying large sums of money, and an inspector for an insurance company can all cause their employers serious loss by failure to perform their jobs properly, but "such employees, obviously, are not performing work of such substantial importance to the management or operation of the business that it can be said to be 'directly related to management policies or general business operations' as that phrase is used in § 541.2." 29 C.F.R. § 541.205(c)(2) (giving the examples of the messenger boy, the equipment operator, and the insurance inspector).

AEP also argues that the level of supervision is relevant to the inquiry, citing an unpublished case, affirmed without comment by the Eleventh Circuit. *Easter v. Florida Power & Light Co.*, Case No. 97-153-CIV-OC-19 (M.D. Fla. June 7, 1999), slip op. at 9, *aff'd* 229 F.3d 1168 (11th Cir. 2000)

(table). While the fact that an employee works independently might shore-up a conclusion that a worker is doing work of "substantial importance," that fact standing alone has little relevance to the inquiry. Night janitorial workers, for example, often work independently and without direct supervision, as do any number of skilled tradesmen such as nonexempt electricians and plumbers.

Finally, AEP suggests we should consider Martin's salary as evidence that his work is of substantial importance since he makes more than "the average blue-collar worker." This argument is an attempt to draw attention away from the fact that Martin's work itself is not substantially important under the regulations. Salary may be used to determine the *primary duty* of an employee who performs both exempt and nonexempt tasks by comparing his salary to the salary of employees who are just doing the nonexempt tasks, *see* 29 C.F.R § 541.103, not to determine the nature of those tasks themselves. Salary differential does not answer the substantial importance question. The fact that a nonexempt, unionized, skilled plumber may earn more than an exempt public school teacher does not change the nature of the plumber's work.

In sum, the evidence viewed in the light most favorable to AEP neither establishes that nor raises a genuine issue of material fact regarding whether Martin's work is "directly related to management policies or general business operations of his employer or his employer's customers." Thus, not only is AEP not entitled to summary judgment, but Martin is entitled to summary judgment.

## C. Liquidated Damages

An employer who violates the FLSA's overtime provisions is liable to the employee in the amount of the unpaid overtime compensation "and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Liquidated damages under the FLSA "are compensation, not a penalty or

punishment." *Elwell v. Univ. Hosp. Home Care Serv.*, 276 F.3d 832, 840 (6th Cir. 2002) (internal quotes omitted). Although liquidated damages are the norm and have even been referred to as "*mandatory*," *see, e.g., Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3rd Cir. 1991) (emphasis in original), Congress has provided the courts with some discretion to limit or deny liquidated damages. *See* 29 U.S.C. § 260; *Martin*, 940 F.2d at 907. Under this exception, if an employer demonstrates *both* good faith and reasonable grounds for the incorrect classification, then a court may exercise its discretion to limit or deny liquidated damages. *Elwell*, 276 F.3d at 840; *Martin*, 940 F.2d at 907. But "[t]his burden on the employer is substantial," *Elwell*, 276 F.3d at 840, and if the employer fails to carry it, the court may not limit or deny liquidated damages. *Elwell*, 276 F.3d at 840; *Martin*, 940 F.2d at 907.

To prove that it acted in good faith, an employer "must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *Martin*, 940 F.2d at 908. "Good faith" means more than merely not willfully misclassifying the employee. *Elwell*, 276 F.3d at 841 n.5. The employer has an affirmative duty to ascertain and meet the FLSA's requirements, and an employer who negligently misclassifies an employee as exempt is not acting in good faith. *Id*. Thus, the violation of the FLSA does not have to be intentional for Martin to recover liquidated damages, and AEP has the burden of establishing that it acted in good faith when affirmatively determining that Martin was exempt. *See Martin*, 940 F.2d at 908.

AEP argues that it acted in good faith because it relied on a form that Martin filled out during the reorganization of the IT department – an "employee mapping form" – on which Martin specified his job level under the new organization as "IT Support Specialist I." Reliance on this mapping does not, however, establish good faith for a variety of reasons.

First, AEP cannot claim reliance on Martin's choice of position when AEP itself instructed Martin to choose the IT Support job family, all of which positions are exempt. Martin testified at deposition that he chose the IT Support Specialist group rather than the technician group because he was instructed to do so by Thornburg. AEP has not disputed this proposition.

Second, even if AEP could rely in good faith on Martin's choice of IT Support Specialist I, it could not, in good faith, classify any employee in that position as exempt without further information because that position description includes both nonexempt and (likely) exempt tasks. The first of the six tasks listed in the IT Job Family Skills Matrix for IT Support Specialist I roughly describes the nonexempt user support work that Martin actually performs. The second task listed – "[p]articipate in the review, evaluation, analysis, and recommendation of information systems and procedures" – may well be exempt. The third task, which requires the employee to "[m]aintain records, documentation, manuals, and prepare status reports," is amorphous and appears in the vast majority of the IT position descriptions, including the nonexempt technician positions. The remaining items are not job tasks per se but merely require the employee to maintain certain skills. But, of course, the exempt work must be the employee's primary duty, and the job description provides no indication the second of the task listed is the primary duty. If anything, the order of the tasks, the name of the job family (IT *Support*), the "typical job tracks" in the job family description, and the mapping instructions ("Support staff/Technicians to maintain [hardware and software] and help customers use them"), all suggest that the first, nonexempt task is primary. Thus, to classify any employee who chose IT Support Specialist I as exempt, AEP would need more information, and the FLSA's good-faith requirement requires AEP to seek it out.

But AEP's misclassification of Martin was not, in fact, based on this lack of information. AEP actually classifies the

entire IT Support job family as exempt, even though positions II through IV do not include any exempt tasks. Thus, AEP would have incorrectly classified Martin as exempt regardless of what level within the job family he chose.

Third, even if Martin had incorrectly picked an actual exempt position in the mapping, AEP cannot claim to have relied on it in good faith when it affirmatively knew that Martin was doing nonexempt work. In addition to Thornburg's knowledge of Martin's actual tasks, two documents labeled "job descriptions" which list all the IT employees' job descriptions demonstrate that AEP knew what kind of work Martin was doing. These documents – dated August 2000 and December 2001 – list Martin's job description as follows: "Workstations, Network Printers, Wiring Closet Hardware, Pagers, Radio Controlled Cranes, Fiber Optics." AEP cannot claim – in the face of this job description – that it actually thought that Martin's primary job duty was "participat[ing] in the review, evaluation, analysis, and recommendation of information systems and procedures." The FLSA requires the employer to make FLSA exemption decisions based on the employee's actual job duties, not the employee's job title, *Ale*, 269 F.3d at 689-90, and the good faith requirement imposes an affirmative burden. AEP may not rely on incorrect information in the face of its actual knowledge of Martin's job activities.

Fourth, the date of reclassification provides additional evidence that AEP was not acting in good faith. AEP actually classified Martin as exempt on November 1, 1998, just as the Cook nuclear reactors were being taken offline for an eighteen-month shutdown, plunging the plant into a period of non-standard activity and hours. As Thornburg explained:

The last three years at this facility have been very non-standard. What I mean by that is we have been in a shutdown outage for three years. We all did non-standard tasks during that three year period of time to install complexes, we install trailers, we install buildings

that are no longer at this facility for that three year period. . . . [W]e were all busy doing whatever we had to do to restart the facilities. . . . [W]e were all doing unusual things. We weren't in normal configuration.

Changing an employees nonexempt status – just as the employer is altering his duties – based solely upon a mapping based on duties performed *before* the change is not in good faith.

Fifth, when AEP was done with its reorganization, *no* employees in the IT department worked in positions classified as nonexempt. AEP has an affirmative obligation under the act not to misclassify employees as exempt, and an affirmative obligation to inquire into classification, *Martin*, 940 F.2d at 908-09, obligations which it failed. AEP was not acting in good faith when it implemented this reorganization which classified all IT workers as exempt. Finally, even if AEP actually believed that it had made the correct classification (which alone is not sufficient to avoid liquidated damages), Martin immediately complained about his classification as exempt, putting AEP on notice of the problem.

Some of this evidence suggests willfulness and some merely suggests negligence, but none of it establishes good faith. Because AEP has not established that it acted in good faith when it classified Martin as exempt, this Court and the district court are without discretion to limit or deny liquidated damages. We need not reach the question of the objective reasonableness of AEP's classification of Martin as exempt.

## III. CONCLUSION

For the reasons stated above, we REVERSE the decisions of the district court and REMAND for entry of summary judgment in favor of plaintiff, and for calculation of damages, including liquidated damages.

**CONCURRING IN PART, DISSENTING IN PART**

ALAN E. NORRIS, Circuit Judge, concurring-in-part and dissenting-in-part. I concur in the majority's ruling insofar as it concludes that the grant of summary judgment in favor of defendant was in error. However, I disagree with the majority's conclusion that there is insufficient evidence in the record for defendant to avoid summary judgment. Genuine issues of material fact exist regarding whether plaintiff was properly categorized as a "computer professional." In particular, deposition testimony reveals that plaintiff had not only been assigned "the Windows 2000 project," but had been sent to training courses aimed at teaching him how to "develop standards that [are] use[d] on [defendant's] operating systems." As plaintiff attended these courses, his duties "evolv[ed]." This testimony demonstrates that plaintiff's primary duties might well have classified him as a "computer professional." Accordingly, I would remand the case for trial.